**UNITED STATES of America,**
**Plaintiff,**

v.

**James J. MATLES, Defendant.**
**Civ. No. 13121.**

United States District Court
E. D. New York.
March 26, 1957.

See also 19 F.R.D. 319.

Leonard ·P. Moore, U. S. Atty., E. D. New York, Brooklyn, N. Y., for the United States, Howard B. Gliedman, El- liott S. Greenspan, Asst. U. S. Attys., Brooklyn, N. Y., of counsel.

Eugene F. Bannigan, Donner, Kinoy & Perlin, New York City, Samuel Gruber, Stamford, Conn., for defendant. Frank J. Donner, Marshall Perlin, New York City, of counsel.

**BRUCHHAUSEN, District Judge.**

The Government instituted this proceeding to cancel the Certificate of Naturalization, issued to the defendant, upon the grounds that it was fraudulently and illegally procured by him. The statute involved, and then in force, is Section 338(a) of the Nationality Act of 1940.[1]

The charges against the defendant, in substance, are as follows:

1. That the defendant falsely answered "No" to Question No. 28 on his Preliminary Form for Petition for Citizenship, to wit: "Do you belong to or are you associated with any organization which teaches or advocates anarchy or the overthrow of existing Government in the United States?" The answer is in the defendant's handwriting.

2. That the defendant falsely answered "No" to the same Question No. 28 when interrogated, under oath, by the Naturalization Examiner, Jacob Meyer.

3. That the defendant falsely answered "No" to the question: "Are you a Communist?" at the hearing conducted by the Examiner.

4. That the defendant falsely stated in Item No. 7 of his verified Petition for Citizenship, that "I (the defendant) am attached to the principles of the Constitution of the United States and well disposed to the good order and happiness of the United States."

5. That the defendant gave false answers as to his belief in the form of government of the United States and as to renouncing allegiance to foreign governments.

6. That the defendant was not a man of good moral character at the time of his naturalization.

---

1. Now 8 U.S.C.A. § 1451(a).

It appears that the defendant, then known as Eichiel Matles Friedman, and a native of Rumania, legally entered this country in January 1929; that in the same year he filed a declaration of intention for citizenship; that the aforesaid Preliminary Form for Petition for Citizenship was executed by him on April 17, 1934; that the hearing before the Examiner was held on August 2, 1934 and that the Certificate of Naturalization was issued to him on November 27, 1934.

The proof shows that shortly after Matles stepped upon the soil of this country in 1929, he plunged into Communist activities and became a Party member and officer; that he followed the Party Line, the Communist Party Line, of practicing fraud and deceit in his application for citizenship so as to facilitate exit from the country, should the Party require his services outside of the country and that he relied upon the secrecy of the Party activities to conceal his real mission and that it has taken years of Congressional investigations and painstaking and laborious inquiry to bring the situation to light.

The evidence also disclosed that Matles, a mechanic by trade, dedicated his time and energies to advance the Communist labor movement; that the Communists were sufficiently astute to refrain from informing non-Communist workers, whether or not organized, that the ultimate aim was to further the cause of International Communism, with headquarters in Russia. This is emphasized in one of the Communist's secret writings, limited to Party members, entitled "Left Wing Communism," Exhibit 6, published in 1919, to wit:

"We must if need be resort to all sorts of stratagems, artifices, illegal methods, to evasions and subterfuges, only so as to get into the trade unions, to remain in them, and to carry on communist work within them at all costs."

Secrecy is also mentioned in the booklet, entitled "Manual on Organization," Exhibit 12, cautioning Party members to refrain from discussing their plans outside of their closed meetings, to avoid keeping membership lists and to destroy all documents after reading them.

It further appears that the Party, including Matles, made full use of its opportunities during the period of the depression from 1929 to 1934; that the Red International Labor Union was an arm of the Communist International; that prior to 1929, the Communists had no effective machinery for infiltration into the labor movement; that their affiliate, The Trade Union Educational League prior to 1929 placed its emphasis on propaganda, inducing workers to join independent unions; that in or about 1929, pursuant to dictates from Moscow, the Party created The Trade Union Unity League, an affiliate of the Red International Labor Union, for the purpose of organizing new Communist controlled unions; that thereafter it intensified its efforts by organizing various industrial unions, one of which was The Steel and Metal Workers Industrial Union, in which Matles was a leader and a dominant factor during the period immediately preceding his application for naturalization and thereafter.

The defendant did not take the stand. Most of his witnesses were officers of Locals of The United Electrical Radio and Machine Workers of America, of which Matles has been director of organization since 1937. Many of them did not meet Matles until long after the time of his naturalization.

Aside from testimony of Government witnesses, later referred to, one of the exhibits in evidence, definitely links Matles to the Communist Party, as well as to the illegal objectives it pursued. It was issued by him within a month prior to the date when he executed the aforesaid Preliminary Petition for Citizenship, wherein he unequivocally certified that he was not associated with an organization advocating the overthrow of our Government. The exhibit, referred to, is the issue of The Daily Worker, the official Communist Party organ, dated March 21, 1934. In that issue

appears an article under the by-line of J. Matles, wherein he urges, his associates to follow the principles outlined in a document termed "The Open Letter." The latter is described in the minutes (299) as "An Open Letter To All Members Of The Communist Party, July 7–10, 1933." It further appears that the "Open Letter" was published by the Central Committee of the Communist Party of the U.S.A. and was adopted by the Extraordinary National Conference of the Party held in New York City on the said dates.

The said "Open Letter" which Matles called upon his followers to adopt, contains the following expressions:

"The organization of * * * the revolutionary trade union movement,

"The transformation of The Daily Worker into a really revolutionary mass paper,

"Establish a solid base amongst decisive elements of the American Proletariat,

"The revolutionizing of the working class by the Party, .

"Struggle against a new imperialist war and intervention against the Soviet Union,

"Comrades: The Party has approved the estimation of the international situation, given by the XII Plenum of the Comintern,

"The members of the Party have shown in countless activities, in strikes, in hunger marches, demonstrations and in painstaking day-to-day work that they are loyal and self-sacrificing revolutionists, .

"Every Party fraction must link this discussion up with concrete tasks."

The defendant, in his aforesaid article in The Daily Worker, dated March 21, 1934, elaborated upon the Party doctrine espoused in the said "Open Letter," by stating therein, "We want to devote this article (referring to the said Daily Worker article) to the problems that confront us in attempting to carry out the open letter in the metal industry—one of four industries that the New York District decided to conquer for the revolutionary movement." Matles also stated in that article, as follows:

" * * * the first and most important part of concentration, is the securing and assigning of capable comrades to tackle the basic industries. * * * We have 5000 Communists in the district, and therefore there are plenty of forces to master these basic industries. The experience of our Russian party, can help us to understand this question much better. The tens of thousands of Communists in the Soviet villages did not succeed in solving the question of collectivization of agriculture. It took a Bolshevik Central Committee to place at the head of these large numbers of Communists in the villages, about 2000 trained and experienced Bolsheviks, and a sharp turn was made, in a very short time. Here in New York our party has great difficulties in finding one dozen capable comrades who can handle these basic industries, and provide leadership to the large number of Communists."

The Government's witnesses, Maurice Malkin, and Joseph Zack Kornfeder, ex-Communists, testified at some length concerning the many Communist meetings and activities involving the defendant. The defense assailed them as professional witnesses and sought to discredit them, although unsuccessfully, in exhaustive cross-examinations, occupying almost 900 pages of the trial record. Their testimony will be commented upon later. At this point it is appropriate to allude to the testimony of the Government's witness Orazio Carlucci, who was not assailable upon that ground.

The witness Carlucci testified as to personal contacts with the defendant in 1933 and 1934, crucial years as far as this proceeding is concerned. It appears that he was then a detective by profession, engaged by a law firm to investigate and report on Communist influences.

in strikes against bakery companies, clients of the law firm; that he joined the Young Communist League and later the Communist Party, not in loyalty but to carry out his investigatory mission; that he had meetings with Rose Wortis, Charles Rivers and Lou Cooper, officials or functionaries of the Communist Party; that the latter two individuals arranged for him to distribute Communist leaflets among the workers; that Rivers was an officer of the Steel and Metal Workers Union and Cooper was with the Radio Workers Union, both Communist organizations; that Carlucci joined the Radio Workers Union; that in the latter part of December 1933, they introduced him to Matles, the organizer and secretary of said Steel and Metal Workers Union, as good material for the Party; that the defendant said: "Good;" that the witness had luncheon with the defendant many times and became well acquainted with him and that they discussed affairs of the Young Communist League and the Party (1949 et sequa). Following are excerpts of his testimony (1972–1993), showing that the defendant taught and advocated the principles of the Party, including the overthrow of government, viz.:

"There were times when we discussed the situation in Russia;

"He (Matles) certainly did (lecture at fraction meetings of the Young Communist League) * * * and Matles on several occasions talked * * * regarding the necessity for the young workers to prepare themselves for the coming revolution.

" * * * the instructions were * * * either from the teachings of Lenin, or the new theory of Stalin regarding Leninism, and the results of the 6th World Congress.

"The revolution would be accomplished by the dictatorship of the proletariat.

"(Matles in substance said) the bourgeoisie or the people in control of the government would not easily let the workers take over. It be-comes necessary, therefore, for the workers to organize themselves politically, physically, in every way possible, so that the end result would be to revolt, and to be able to carry the revolt to a successful conclusion. * * * There would be no other way (but to use force) because you would have to fight the police, you would have to fight the Army, you would have to fight the National Guard. * * * The existing government * * * was to be overthrown by violence * * * and this is what Matles himself advocated * * * at these meetings."

The witness Carlucci had not previously testified for the Government. It was brought out that he was convicted on a charge of robbery, committed when he was 18 years of age, that he was placed on probation and subsequently pardoned. Later he served four and a half years in the Army in World War II, mostly as Chief Agent for the Criminal Investigation Division in Berlin and received a number of citations and decorations. He impressed the Court as a truthful, reliable witness. The Government's witnesses Maurice Malkin, Joseph Zack Kornfeder, Robert Pitcoff, Charles W. Campbell and Bernard K. Johnpoll, also testified as to Communist activities of Matles during the period of the naturalization proceedings. Some of them gave expert evidence upon the teachings and doctrines of Communism, which will be later alluded to.

The witness Malkin testified that he was a charter member of the Communist Party from 1919 until 1937 (128, 129), that he served the Party at various times as circulation manager of The Daily Worker, instructor in the Worker's School, as member of the District Executive Committee and as member of the National Committee of the Trade Union Educational League and attended numerous meetings and conventions, restricted to Party members.

The witness Malkin also testified to his attendance at a number of closed Party meetings, which Matles attended, be-

tween 1930 and 1934; including the aforementioned extraordinary meeting of the Party, in July 1933, when the "Open Letter" was approved. He related that not only did Matles attend as a member of the District Committee of the Party but that he took an active part in securing the approval of the letter; that he expressed himself in favor of the new line taken by the Party; that throughout the discussion the term "revolutionary" was mentioned, meaning that the Party was leading the workers towards the revolutionary overthrow of Capitalism by force and violence (301, 310 et sequa). He took the floor and criticized Party shortcomings in penetration and mass work (464–473).

Malkin further testified that in the early spring of 1931 he met Matles at Party Headquarters at 38 East 12th Street, New York, in the inner sanctum, restricted to Party District officials; that he there conferred with Rose Wortis, a Party functionary, who addressed him as Comrade; that the witness saw Matles there four or five times in that period; that they were all closed meetings; that he also met him at the Party Workers School at 50 East 13th Street, New York, restricted to Party members and that Rose Wortis and Kornfeder spoke, also Matles, as a representative of the Metal Workers (444–460).

Matles also attended the six-day Party Convention in Cleveland in the spring of 1934, as a delegate (476, 477). He there delivered a half-hour address on the subject of Party concentration on basic industries (824, 825).

Malkin stated that at that time Matles was a member of the Trade Union Labor Committee of the Party, a group charged with formulating policy and resolutions in connection with Communist trade union activities (477). The witness further stated that in that year he met him at the office of the Trade Union Unity Council (477); that in the fall of that year Matles attended a closed Communist membership meeting and led a half hour discussion on the question of liquidating the existing Red Unions and forming in-dependent Unions; that he was introduced as Comrade and as a representative of the Communist District Executive Committee (479 to 484, 826).

It will be recalled that on April 17th of that year, 1934, Matles signed the Preliminary Petition for Citizenship and that on August 2, 1934, he was questioned by the Examiner.

The witness Joseph Zack Kornfeder testified that he was a member of the Party from 1919 to about October 1934 (1091); that his specific function was to organize Communists in Labor Unions and gain control of those organizations; that from 1927 to 1930 he attended the Lenin School in Moscow; that in May 1930, he met Matles at the Communist National Convention in New York, a meeting restricted to Party members (1305); that the witness thereafter and until the end of 1931 was in charge of Party affairs in South America; that upon his return to New York in the latter part of 1931 he was put in charge of Party Trade Union activities in the New York area; that he then again worked with Matles, who was a member of the District Committee (1306, 1312); that shortly thereafter he caused Matles to be placed in charge of the Steel and Metal Workers Union, a branch of the Party (1313); that Kornfeder's and Matles' offices were on the same floor; that, as secretary of the said Union, Matles attended closed Party meetings once or twice a week (1315); that Matles frequently discussed the meaning and objectives of the Party and of the Steel and Metal Workers Division of it (1239) and that he met Matles at the aforesaid Party Convention in Cleveland in 1934 and discussed the aforesaid article in the March 21, 1934 issue of The Daily Worker, which Matles admitted he wrote (1324, 1325).

The witness Pitcoff testified that he was a member of the Party from 1926 to October 1934 (943); that during part of the time he was employed by The Amtorg Trading Corporation; that in 1932 he became secretary of the building and construction fraction of the Trade

Union Unity League and held that office several years (945); that he first met Matles in 1932 at a district meeting of the League (953) and frequently thereafter at meetings at which Communist Party matters were discussed (957).

The witness Campbell testified that he was a member of the Party from 1930 to 1936; that he was a section organizer in Waterbury, Connecticut most of that time (1168); that he was one of the leaders of the Steel and Metal Workers Union; that in 1934 as a delegate he attended three or four closed meetings, two of which took place in the inner sanctum at the offices of the Party in New York (1176) and that Matles presided at those "closed" meetings, introduced members as Comrade and discussed Communist Union activities (1177).

The witness Johnpoll testified that he met Matles in 1933, in the course of a strike at a New York plant and that Matles suggested that he join the Young Communist League (1257).

It was developed that the failure of Matles to enroll in elections, under a Party emblem, was in line with the Communist teachings and policy (3803, 3814).

The defendant produced a number of witnesses only five of whom testified that they were acquainted with Matles during the period from 1929 to 1934, i. e., Mrs. Matles, Carl Bersing, Alfred Coulthard, James Martin and Philip Uretsky.

Mrs. Matles' testimony was limited to activities of the defendant before his legal entry into this country in 1929, apparently to rebut Kornfeder's claim that he had met him prior to that time.

The defendant's witness Bersing testified that during the period from 1937 to 1944 he was employed by the United Electrical Union of which Matles was director of organization (1996); that Matles was an influential factor in connection with that employment; that he met Matles a number of times in 1933 and 1934 in or near Camden, New Jersey and twice in New York City; that he discussed the formation of independent Unions (2006) but never mentioned Communism (2011). On cross-examination the witness stated that Matles did not inform him what organization he was connected with (2060) and that he did not know whether Matles had an office address (2062).

The defendant's witness Coulthard testified that he first met Matles in the spring of 1934 and three or four times thereafter in that year (2496) in connection with the N.R.A.Code and that he did not mention Communism and that he never attended a Communist meeting with him (2525).

The defendant's witness Martin testified that he met Matles in 1932; that he joined his Union (2555); that he only met him at general membership meetings of the Union at its Hall on 19th Street as often as two or three times a week from 1932 to 1936 (2554, 2562, 2572) and that Matles did not mention Communism.

The defendant's witness Uretsky testified to the same effect, also that the meetings were held in the Meeting Hall at 35 East 19th Street (2603) and that he distributed the Union leaflet for Matles, defendant's Exhibit F–1. However, on cross-examination, he was questioned as to the following statement in the exhibit, viz.:

> "Our Union has in its ranks and in the leadership, workers of all political views—Democrats, Republicans, Communists and Socialists."

The witness said he questioned Matles about this and that the latter replied that Communists have to make a living but that Communists would not belong to the Union as Communists nor be allowed to discuss Communism (2630).

Generally, on cross-examination, the defendant's witnesses stated that if Matles had told them he advocated the principles of Communism, they would have withdrawn from the Union and made efforts to expose or oust him.

It will be noted that the aforesaid meetings between the defendant's witnesses and Matles, according to their statements, were held in the general meeting place of the Steel and Metal Workers Union on 19th Street and not at the Communist Party Headquarters. This is in keeping with the secretive policy of the Party to have their closed meetings, attended only by Communist members of the Union, separate and apart from the general meetings of persons whom they hoped to draw into the Unions, without informing them of their real aims and subversive purposes.

The Government introduced testimony of experts and extracts from a number of exhibits, identified as required reading by members of the Communist Party (180). This line of proof was submitted to show that the Party taught or advocated the overthrow of this Government and to establish that Matles gave false answers when he denied that he belonged to or was associated with any organization, teaching or advocating those doctrines.

The Exhibits are described as follows:

A Thesis and Statutes of the Third Communist International adopted by the Second Congress, July 17—August 7, 1920 (Ex. 4) (145).

Communist Manifesto by Karl Marx and Frederick Engels, published in 1932 as a reprint of earlier editions (Ex. 5) (146).

Left Wing Communism by V. I. Lenin, 1940 Edition, a reprint of the 1920 and 1921 Editions (Ex. 6, page 147).

State and Revolution by V. I. Lenin, 1932 Edition, (a reprint of 1920 and 1921 editions) (Ex. 7, pages 147, 148).

Program of the Communist International (Ex. 8, page 151).

The Communist Party in Action by Alex Bittleman (Ex. 9, page 151).

Why Communism?, by M. J. Olgin (Ex. 10, page 151).

The Struggle against Imperialist War and the Task of the Communists, Resolution of the Sixth World Congress of Communist International, July–August, 1928 (Ex. 11, page 152).

The Communist Party, a Manual on Organization, by J. Peters (Ex. 12, page 152).

An Open Letter to all Members of the Communist Party, July 7–10, 1933 (Ex. 13, page 153).

Ultimate Aim (Ex. 14, page 153).

Problems of Leninism by Joseph Stalin (Ex. 15, page 153).

The Trade Union Unity League, its Program, Structure, Methods and History (Ex. 16, page 153).

Report to the Eighth Convention, Communist Party, by Earl Browder (Ex. 17, page 154).

The Way Out, a Program for American Labor. Manifesto and Principal Resolutions Adopted by the Eighth Convention of the Communist Party of the U.S.A. (Ex. 18, page 154).

Revolutionary Greetings (Ex. 19, page 154).

Communist Election Program against Imperialist War, for Jobs and Bread—Vote Communist, June 1932 (Ex. 20, page 155).

Foster and Ford for Food and Freedom—Acceptance Speeches of Foster and Ford, 1932 (Ex. 21, page 155).

The Government's evidence on the subject of Communism divides itself into several categories, i. e., the objectives of the Communist Party and the means to be employed for their attainment.

The Government's Evidence as to the Objectives of the Communist Party, Including the Overthrow of This Government.

Following are extracts from the Exhibits:

"The class struggle in almost every country of Europe and America is entering the phase of Civil War. Under such conditions the Communists can have no confidence in bourgeois laws. They should create everywhere a parallel illegal apparatus, which at the decisive moment

should do its duty by the party, and in every way possible assist the revolution * * * a revolutionary overthrow of capitalism * * * (Ex. 4) (191, 193) * * * (By revolutionary is meant) the ultimate aim, the overthrow of capitalism by force and violence (Malkin, 196). The basic aim was the overthrow of the American capitalistic government by force of violence and the establishment of a Soviet dictatorship known as the dictatorship of the proletariat in the United States.

"The Communists disdain to conceal their views and aims. They openly declare that their ends can be attained only by the forcible overthrow of all existing social conditions. Let the ruling classes tremble at a Communist revolution (Ex. 5) (204).

" * * * it is clear that the liberation of the oppressed class is impossible not only without a violent revolution, but also without the destruction of the apparatus of state power * * * (Ex. 7) (208).

"The conquest of power by the proletariat is the violent overthrow of bourgeois power, the destruction of the capitalist state apparatus (bourgeois armies, police, bureaucratic hierarchy, the judiciary, parliaments, et cetera), and substituting in its place, new organs of proletarian power, to serve primarily as instruments for the suppression of the exploiters (Ex. 8, page 237).

"The Soviet State completely disarms the bourgeoisie and concentrates all arms in the hands of the proletariat; it is the armed proletarian State (Ex. 8, page 238).

"In order that revolutionary work and revolutionary action may be coordinated * * * the proletariat must be bound by international class discipline.

"* * * the revolutionary proletariat must be ready, in the event of a general strike, firmly to steer a course towards transforming the strike into an armed rebellion, if conditions are propitious for that (Ex. 11, page 291).

"Struggle against a new imperialist war and intervention against the Soviet Union and against financial and military support of Japanese Imperialism (Ex. 13, page 308).

"The members of the Party have shown in countless activities, in strikes, in hunger marches, demonstrations and in painstaking day-to-day work, that they are loyal and self-sacrificing revolutionists (Ex. 13, page 309).

"Socialism takes the place of capitalism only as a result of the proletarian revolution and the dictatorship of the proletariat. It is essential for the victory of socialism to overthrow the rule of the bourgeoisie by force and to establish the rule of the proletariat. Only by seizing state power and creating its own proletarian state can the working class commence socialist construction and build a socialist society. * * * The proletarian State is a Soviet State (Ex. 14, page 316, 323).

"* * * to consolidate everything that is most active, intelligent, fearless and loyal in the working class into a compact, monolithic leadership of the mass struggle, into the Communist Party, organically united with the revolutionary workers and oppressed peoples of the world in our Communist International * * * we help them (the workers) to understand that to realize a full and happy life, they will finally have to take power, overthrow the capitalists and take possession of the industries themselves through their own Workers' Government (Ex. 17, page 360)."

The witnesses Malkin, Kornfeder, Pitcoff and Campbell, experts or students of Communism and former members of the Party also testified that the Party

taught and advocated the overthrow of this Government by force and violence (M–880; K–1137, 1241, 1281, 1878; pages 960, 961; C–1171.

The Communist Party in the United States was a part of the Communist International and bore allegiance to the Soviet Republics (Ex. 4 at p. 197; Ex. 10 at pages 277, 278; Ex. 14 at pages 330, 331; Ex. 16 at pages 346–348, 353–355; Ex. 18 at pages 364, 365; Ex. 21 at page 403; Ex. 12, pages 3825, 3826; M–132, 133, 142, 435, 436; K–1102, 1115, 1120, 1121, 1136, 1151–1153.

Even the defendant's witness, Broadus Mitchell, whose knowledge and experience as to Communist doctrines was extremely limited and superficial, conceded that they stood for the overthrow of this Goverment by force and violence (2759).

### As to the Means Employed by the Communists to Overthrow This Government

The witness Kornfeder testified at length as to the doctrines of the Communist Party and the tactics they employed to effectuate them, particularly in the trade union movement. He became a charter member of the Party in this country in 1919. As previously stated he attended the Lenin School in Moscow for three years, was in charge of Communist activity in South America for more than a year and for a time the head of the Party's trade union activities in the New York area (1125, 1127), then he was transferred to Ohio and continued there in Communist work for several years.

At the Lenin School Kornfeder was instructed in the methods of accomplishing the overthrow of Government, including the use of arms, machine guns and grenades, the tactics used in perfecting the overthrow of Czarism, a three months course under Russian Army Officers on how to overthrow a city (1132–1140). He was also taught that the trade union activity by Communists was an aid to Party insurrection, that Communist controlled unions were to operate by declaring a general strike or tying up particular services and paralyzing Government and that factory workers were to bear arms (1140).

Kornfeder related that the Communist doctrine was that if basic industries were tied up or disrupted in time of war, especially where Russia was involved, it would help that country, also that if a favorable situation arose to overthrow this Government, it could best be achieved through the masses of people in industry (1131).

Mr. Kornfeder further testified that Communist policy was to enlist the workers in their Unions by deception, telling them that their aim was to better their working conditions, but their undisclosed purpose was to use the workers to further the Communist objective of overthrow of Government. In this connection, he said:

"It (the use of Aesopian language, as Lenin termed it) came to be used as a—as a system of putting over Communist organization under the pretense that it is an organization serving desirable reforms or serving purposes of human welfare. * * * Well, I would say that Lenin's, and other Communist leaders', continued claim that their doctrine and that the Communist Party represents the working class when actually they all mean that the seizure of power is an operation by the Communist Party and for the Communist Party—they always speak in the name of the Proletariat.

"Actually they mean the Communist Party.

"But, for the working man, it sounds much better when they say their doctrine represents him. If they would say that they aim to put the Communist Party into power the working man would begin to question, 'Well, does that party represent me? What is it going to do?'

"So, by using the claim that the party represents the Proletariat, acts in the name of the Proletariat,

rules in the name of the Proletariat, calling their regime the dictatorship of the Proletariat instead of admitting the plain fact it is the dictatorship just of the Communist Party, was a further development of this idea of using deception for revolutionary purposes (1234, 1235).

"The objectives generally were the same as the objectives of the Communists—to overthrow existing society and existing democratic governments.

"But the specific operation for which the Red International of Labor Unions was designed was to approach the working man from a trade union point of view and, as it were, soften them up for the Communist program by advancing far-fetched or desirable demands and egging them on to more militancy, lead them on in the direction of the Communist program (1241).

"In the total complex of Communist strategy, key industries, transports and communications, played the utmost strategic role; that everything is concentrated together into those places, to entrench one's self there and then use the power thus achieved for Communist purposes.

"The ultimate objective or the strategy in the main was to use labor unions in strategic industry, to harass the economic system of present-day society, demoralize it as much as possible, and in case of major economic crisis or war, especially in the case of war with the Soviet Union, to use these unions to sabotage the Government and to paralyze the vital parts of defense production wherever possible (1243).

"Political sabotage, if I may illustrate, if one sabotages a vital piece of equipment it may be put out of commission for a matter of hours or maybe a few days till it is repaired. But if you can provoke a strike under the pretense of obtaining desirable demands and then handle the strike in such a manner that it would last for weeks or months, well, you can then tie up the entire field for that period of time and, furthermore, it has the advantage of being a legal operation (1244).

"There are other forms. For instance, if you can demoralize a fighting unit it is more important than to sabotage a piece of ordnance.

"For this type of operation they have the organizations amongst the youth, the future soldiers, to alienate their loyalty to the country, even if they don't make them Communists, is one of the principal tactical aims and plays a role in the concept of organizing political sabotage.

"Also, if you have a communications union that handles cables of a military nature, you can delay the transmission of these cables or, perchance, change the wording which may make all the difference in the world at the point of reception (1244, 1245).

"The Communist doctrine and system, as it were, appoints itself the leader, and then, once it is in power through the help of the workers—and Lenin's doctrine calls for every effort to get the workers on their side—but once they are in power there is no way of the working men getting rid of them, no matter what they do, because the same system and doctrine calls for the suppression of all opposition once they are in power. No opposition. No opposition party. No criticism is allowed.

"So by disposing of all critics and opponents and potential opponents once they are in power they cannot be dismissed, which in fact means of course that they are not the authorized leaders of the working men. They have never been selected, and they cannot be dismissed.

"Those are the actual realities and the conflicts between the claims that

they represent the working class and the actual fact." (1282).

Where Communists control the Government, none of the rights and privileges, accorded under our form of Government exist (925–931, 1351, 1368, 3841). Dictatorship of the proletariat is achieved when the Communist Party gains control. Opponents are killed or sent to concentration camps (340).

The following are excerpts from Exhibit 36, entitled "World Trades Union Movement" by Earl R. Browder, viz.:

"The Trade Union Educational League has reached the minds of hundreds of thousands of trade unionists and influenced the decisions of at least 2,000,000. From the broad slogans that stir the masses, it has intensively developed the issue of revolutionary unionism until today it represents the organized struggle within the unions against every phase of capitalistic influence and bourgeois ideology (1291).

"What are the characteristics of the fourth type of the trade union movement? We characterized it as 'Communist.' But, doesn't that mean that the trade union movement is the same as the Party movement?—It is first of all Communist by its contents, by its tactics, aims and methods of struggle, although it officially is not a part of one or another party. The Party is supposed to have only an ideological leadership of the trade union movement" (1292).

The following are extracts from Exhibit 37, entitled "Strike Strategy" by William Z. Foster, viz.:

"The general strike is no toy. It is a revolutionary weapon of the first order (1298).

"The question of fully stopping the use of the state power by the capitalists against the workers in strikes and other labor struggles raises the central problem of the whole labor movement, the problem of the overthrow of the capitalist system" (1300).

The following are extracts from Exhibit 38, Problems of Strike Strategy, viz.:

"The Majority of Strikes suffer from repression, government protection of strike-breakers, obligatory arbitration, etc. The principal thing is to have the worker understand from his experiences in the struggle that the Government is protecting the employers * * * against the workers, that the courts, press, church, etc., which are supposed to be beyond the classes are also in the pay of the employers. * * * The enthusiasm prevailing among the masses during strikes should be utilized for strengthening the campaign for the defense of the Soviet Union. Every worker must understand the very close connection between the preparation for war against the proletarian state, and the intensification of all means of exploitation, repression and terror which capitalism is forcing upon him for the sake of capitalist stabilization (1348, 1349).

"During strikes the revolutionary trade unions must give especial attention to mobilizing the workers in those industries which can easily be converted into war industries. Also, among the railway workers it is necessary to popularize the slogans of the general strike, mass strikes and tying up of transportation in war time. In the struggle against imperialist war it is necessary to fight against all forms of military organizations and militarization functioning in the shops and factories" (1349).

Summary of the Fraudulent Acts, Committed by the Defendant in the Proceeding for His Naturalization and the Law Pertaining Thereto.

Admission to citizenship is not automatic. The applicant must possess the

requisite qualities. To ascertain the facts in each case, the Government has prepared various application forms, including a preliminary form for petition and petition, containing a number of questions, which must be answered.

Matles made a false answer to Question 28 in the preliminary form for petition, dated April 17, 1934, when he denied that he belonged to or was associated with any organization teaching or advocating the overthrow of this Government. The fact is that he did belong to such an organization, the Communist Party, and knew that the Party taught and advocated that doctrine, also that he was extremely active in promoting that objective.

Matles also made a false answer to Item No. 7 in his verified petition, in stating that he was attached to the principles of the Constitution of the United States and well disposed to the good order and happiness thereof. The fact is that he was not attached to those principles.

Matles also committed fraud in his peition and oath of allegiance when he stated that he renounced all allegiance and fidelity to any foreign state or sovereignty, when in fact he gave allegiance to the Soviet Government and its agencies and affiliates.

After the petition and other papers were executed by Matles, Jacob Meyer, the Naturalization Examiner, pursuant to the usual practice, conducted an oral examination of Matles, under oath, to ascertain his fitness for citizenship (33–37, 118). Matles gave false answers to the following questions, viz.:

1. As to his belief in our form of Government.

2. As to his renunciation of allegiance and fidelity to any foreign state or sovereignty.

3. As to whether he belonged to any organization, teaching or advocating the overthrow of this Government.

4. As to whether he was a Communist or belonged to any Communist organization.

The statute, authorizing a proceeding to revoke a naturalization certificate, in force at the time this proceeding was instituted, was Section 338(a) of the Nationality Act of 1940. The grounds stated therein were fraud or illegal procurement.

At the time of the defendant's naturalization the Nationality Act of 1906, as amended, was in effect. It contained the following pertinent provisions:

"Section 4 * * * Fourth. It shall be made to appear to the satisfaction of the court admitting any alien to citizenship that immediately preceding the date of his application he has resided continuously within the United States five years at least * * * and during that time has behaved as a man of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the same. * * *

"Sec. 7. That no person who disbelieves in or who is opposed to organized government, or who is a member of or affiliated with any organization entertaining and teaching such belief in or opposition to organized government * * * shall be naturalized or be made a citizen of the United States." 34 Stat. 598.[2]

It has been held that an applicant has no natural right to citizenship, that whatever right exists is limited by the terms of the statute and further, that the applicant has the burden of showing by satisfactory evidence that he has the specified qualifications; United States v. Schwimmer, 1929, 279 U.S. 644, 49 S.Ct. 448, 73 L.Ed. 889; Tutun v. United States, 1926, 270 U.S. 568, 46 S. Ct. 425, 70 L.Ed. 738; and that "an alien has no moral nor constitutional right to retain the privileges of citizenship if, by

2. Now 8 U.S.C.A. §§ 1424(a), 1427(a).

98

false evidence or the like, an imposition has been practiced upon the court, without which the certificate of citizenship could not and would not have been issued." Johannessen v. United States, 225 U.S. 227, 32 S.Ct. 613, 616, 56 L.Ed. 1066. It is assumed that the Court grants the certificate, relying upon the evidence submitted by the applicant. United States v. Corrado, D.C., 121 F. Supp. 75.

"If [the certificate of naturalization is] procured when prescribed qualifications have no existence in fact, it is illegally procured * * *." United States v. Ginsberg, 1916, 243 U.S. 472, 37 S.Ct. 422, 425, 61 L.Ed. 853. The statute, Section 4(4) supra, prescribes that during the period of five years immediately preceding the date of the application, the applicant shall behave as a man of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the same. An applicant, making false answers to the application is not a person of good moral character and attached to the principles of the United States Constitution. Del Guercio v. Pupko, 9 Cir., 160 F.2d 799; United States v. De Francis, 60 App.D.C. 207, 50 F.2d 497; United States v. Accardo, D.C., 113 F.Supp. 783; United States v. Charnowola, D.C., 109 F.Supp. 810, affirmed 211 F.2d 118, certiorari denied 348 U.S. 817, 75 S.Ct. 28, 99 L.Ed. 644; United States v. Nowak, D.C., 133 F.Supp. 191.

In Knauer v. United States, 1945, 328 U.S. 654, 66 S.Ct. 1304, 1314, 90 L.Ed. 1500, it was held that fraud connotes perjury, falsification, concealment and misrepresentation also that "cancellation of a certificate on the grounds of fraud includes cancellation for fasely swearing that the applicant forswore allegiance to his native country."

The defendant's motions are denied.

A decree is directed, revoking and setting aside the order admitting James J. Matles to citizenship and for the further relief, demanded in the complaint.