James J. Matles and Esther Matles v. Commissioner.
Matles v. Commissioner
Docket No. 93546.
United States Tax Court
T.C. Memo 1964-248; 1964 Tax Ct. Memo LEXIS 88; 23 T.C.M. (CCH) 1489; T.C.M. (RIA) 64248; September 23, 1964
Frank J. Donner, 342 Madison Ave., New York, N. Y., and Robert Lewis, for the petitioners. Leon M. Kerry, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in petitioners' income taxes in the amounts of $2,448.26 and $1,925.10 for the calendar years 1955 and 1956, respectively. The issues for decision are: (1) Whether payments made by the employer of James J. Matles for legal expenses in connection with denaturalization proceedings against Matles in each of the years 1955 and 1956 constitute taxable income to Matles, and if so, whether the amounts of such expenditures are deductible by Matles as ordinary and necessary business expenses. (2) Whether petitioners are entitled to a *89 dependency exemption deduction in each of the years 1955 and 1956 for the mother of James J. Matles, and if so, whether certain of the payments made by petitioners on her behalf constitute medical expenses. (3) To what extent have petitioners substantiated their claimed medical expenditures. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife, residing during the years 1955 and 1956 in Brooklyn, New York, filed joint Federal income tax returns for those years with the district director of internal revenue, Brooklyn, New York. James J. Matles (hereinafter sometimes referred to as petitioner) was, during 1955 and 1956, the Director of Organization of the United Electrical, Radio and Machine Workers of America (hereinafter sometimes referred to as UE), a labor organization. UE was founded in March 1936 through an amalgamation of labor organizations in the industry, including the Federation of Metal and Allied Unions, of which petitioner was the secretary. Petitioner was elected to the office of Director of Organization by the annual UE convention for every year from June 1937 until November 1962, at which time he *90 was elected General Secretary-Treasurer. The duties and salary of the Director of Organization during the years 1955 and 1956 as set out in article 8 of the UE Constitution were: Section A. The Director of Organization shall coordinate the work of the International Representatives and Field Organizers appointed by the General Executive Board and paid from the General Fund. The Director of Organization shall substitute for the General President in any of his duties during his absence or upon his request. He shall submit a quarterly report to the General Executive Board, District Councils and Locals. He shall be, between Executive Board meetings, answerable to the General President. Section B. He shall be paid a salary of an amount at least equal to the highest weekly wage paid in the industry but not more than SEVENTY-FIVE HUNDRED ($7,500.00) DOLLARS PER YEAR. * * *
For the years 1955 and 1956 petitioner's annual salary was $6,750. On December 16, 1952, a complaint was filed in the United States District Court for the Eastern District of New York seeking the denaturalization of petitioner on the basis that he, when admitted to citizenship on November 27, 1934, had falsely *91 alleged that he, inter alia, fully believed in the form of government of the United States; belonged to no organization teaching or advocating the overthrow of the existing government; was not a disbeliever in or opposed to organized government; and would support and defend the Constitution and laws of the United States against all enemies. The complaint charged that from 1929 until the date of his naturalization petitioner was an active member of the Communist Party, which advocated or taught the overthrow by force of the government of the United States, and that he had continued his membership to the date of the filing of the complaint. The complaint alleged that during the period of his membership petitioner accepted and performed all the obligations of membership in the Communist Party and bore allegiance to the Union of Soviet Socialist Republics. Further alleging that the petitioner was not a person of good moral character at the time of his naturalization, and that petitioner deliberately and intentionally made false statements in his naturalization proceedings, the complaint sought to vacate, cancel, and set aside petitioner's certificate of naturalization. After the filing *92 of the complaint, competing organizations began a campaign in shops represented by UE urging the UE members to repudiate and secede from UE. The competing organizations filed petitions with the National Labor Relations Board (NLRB) for elections in a number of plants, successfully working toward the secession of locals in some cases. The rival unions also circulated literature referring to the denaturalization proceeding instituted against petitioner and directly attacking petitioner's loyalty to the United States. At the 18th Convention of UE, in September 1953, a resolution entitled "Support of James J. Matles * * *" was passed, endorsing a "mass campaign by the National Union for the defense of" petitioner on the ground that the attack on petitioner's citizenship was "part of the national pattern to silence the voice of militant trade unionists." At UE's 20th Convention, in September 1955, a resolution on "UE Director of Organization, James J. Matles" was passed, in which it was resolved that the "National Union be called upon to develop a program involving all Locals and Districts in the defense" of petitioner and "that he be afforded all necessary legal assistance required *93 to defeat this attack." The General Executive Board of UE was authorized and directed by the Convention "to act as a Committee for the defense" of petitioner "against the efforts being made to deprive him of his citizenship." The "attack" on petitioner was stated to be "really an attack upon the wages, seniority, paid vacations, paid holidays, and other benefits the workers of the industry are enjoying today as a result of UE's accomplishments." UE's constitution provides for "the recall of any General Officer" during his term of office through a petition initiated by a local. No petition was ever filed to recall petitioner. He was never recalled. The resolution adopted at the 20th UE Convention was implemented at a meeting of UE's General Executive Board on September 23, 1955. The Board authorized "the establishment of a defense fund" and empowered "the General Officers to make the necessary legal and other financial arrangements." In 1952, at the time petitioner was served with the complaint in the denaturalization proceedings, there was in existence the American Committee for the Protection of the Foreign Born, which undertook to assist, without charging any fee, in the defense *94 of persons involved in denaturalization proceedings. Section 9(h) of the Labor Management Relations Act, 1947 (Pub. L. 101, 80th Cong., 1st Sess.), also known as the Taft-Hartley Act, required the filing of an "affidavit * * * by each officer" of a labor organization "that he is not a member of the Communist Party or affiliated with such party, and that he does not believe in, and is not a member of or supports any organization that believes in or teaches, the overthrow of the United States Government by force or by any illegal or unconstitutional methods," in order for such labor organization to come within certain provisions of the Act. As UE's Director of Organization petitioner filed with the NLRB an "Affidavit of Non-Communist Union Officer" yearly from 1949 through 1959, in which year section 9(h) of the Taft-Hartley Act was repealed. Prior to 1949 the officers of UE, including petitioner, had not filed affidavits with the NLRB. As a result, UE had been unable to participate in representation proceedings before the NLRB and was subject to attack by other unions. In addition, recognition by the General Electric Company (GE) of UE as the bargaining representative of those *95 employed by GE at its Knolls Atomic Power Laboratory, Schenectady, New York, had been withdrawn after receipt by GE of a letter dated November 1, 1948, from the Chairman of the United States Atomic Energy Commission (AEC) reciting the fact that the officers of UE had failed to file non-Communist affidavits under the Labor Management Relations Act and directing that GE withdraw and withhold recognition from UE in respect of any of its employees engaged on work at installations in the Schenectady area owned or leased by AEC or engaged in atomic work defined as classified by AEC. On November 25, 1952, a grand jury of the United States District Court for the Southern District of New York issued a "presentment." This document recited that the grand jury had "received evidence to the effect that a number of responsible officials of some unaffiliated unions have long histories of Communist membership and activity"; that 13 officials who were "responsible officers" of UE and 3 other unions had been subpenaed; that these unnamed officials had invoked their privilege against self-incrimination when asked about the non-Communist affidavits they had filed; that therefore the affidavits were *96 not "worth the paper they are written on"; and that there was "obvious non-compliance with section 9(h) of the Taft-Hartley Act. The grand jury then recommended that the NLRB revoke the certification of UE and the other unions involved. Pursuant to the grand jury's recommendation, the NLRB issued a notice directing the individual petitioners to affirm the truth of the non-Communist affidavits previously filed by them. On January 27, 1953, the NLRB was permanently enjoined from ordering these union officials to reaffirm their non- Communist oaths. United Electrical, Radio & Machine Workers v. Herzog, 110 F. Supp. 220 (D.D.C., 1953), affd. 211 F. 2d 36 (C.A.D.C., 1953), certiorari denied 347 U.S. 943. In a conference attended by UE's officers and members of the firm of attorneys retained by UE (hereinafter sometimes referred to as counsel), held subsequent to the filing of the denaturalization complaint in December 1952, UE's officers asked about the impact of the denaturalization proceeding on the status of UE and on the validity of the Taft-Hartley affidavits. Counsel advised that, since petitioner was charged with being a member or supporter *97 of the Communist Party as of the time the denaturalization complaint was brought, the denaturalization proceeding could have a substantial impact upon UE and its right to qualify under the National Labor Relations Act, 1935 (Pub. L. 398, 74th Cong., 1st Sess.) for representation proceedings. Counsel further advised that petitioner's Taft-Hartley affidavits were imperiled, and that UE could be subject to administrative or judicial attack. As a result of the conference, counsel was asked to make all necessary legal and factual investigations for a proper defense of petitioner in the denaturalization proceeding. In 1954 Congress enacted the Communist Control Act (Pub. L. 637, 83d Cong., 2d Sess.), which was specifically directed at unions, such as UE, not affiliated in good standing with national labor organizations opposing Communism. If such unions were found to be "Communist-infiltrated organizations," they became ineligible to represent employees under the National Labor Relations Act. A "Communist-infiltrated organization" was defined as an organization "substantially directed, dominated, or controlled by an individual or individuals who are, or who within three years have been *98 actively engaged in giving aid or support" to Communism, and which "is serving, or within three years has served, as a means" for the giving of aid or support to Communism or for the impairment of United States military strength or industrial capacity to furnish material support required by the Armed Forces. In a discussion between UE's officers and counsel concerning the Communist Control Act and the denaturalization proceeding against petitioner, counsel brought to the officers' attention the fact that, in a proceeding under the Communist Control Act, the denaturalization proceeding and evidence adduced pursuant to it might be used against UE. It was concluded that the evidence in both proceedings would be essentially the same, and that counsel's research would overlap to a large extent. Counsel was authorized to hire stenographic and research personnel to conduct factual research as to potential witnesses and the past activity of UE. On December 20, 1955, the Attorney General of the United States filed with the Subversive Activities Control Board (SACB) a petition against UE under the Communist Control Act. The petition sought from the SACB "an order, after appropriate proceedings, *99 determining that" UE "is a Communist-infiltrated organization as defined by * * * the Communist Control Act of 1954." The petition alleged, inter alia, that the "effective management of" UE "is dominated and controlled by individuals * * * who are and for a period of three years preceding the filing of this petition and prior thereto have been members of Communist organizations with knowledge of their nature and purpose, and who during the samd [same] period of time have been engaged in giving aid and support to such organizations * * *." At the time of filing the petition, the Attorney General issued a press release stating that the petition had been filed under the Communist Control Act and summarizing its allegations. The press release further stated: * * * [UE] is said to have approximately 100,000 members with headquarters in New York City at 11 East 51st Street. According to the Department of Labor's latest directory, the President is Albert J. Fitzgerald and the Secretary-Treasurer is Julius Emspak. * * *
The leadership is said to consist of individuals "who are and for a period of three years preceding the filing of this petition and prior thereto have been *100 members of Communist organizations * * * giving aid and support to such organizations, to Communist foreign governments and to the world Communist movement." Besides the two officials named in the Department of Labor's directory, * * * [UE] has on its roster James Matles, Director of Organization, now facing in Brooklyn, New York, denaturalization proceedings charging him with misrepresentation as to his affiliation with the Communist Party. * * *
UE filed its answer to the petition on February 11, 1957. On March 20, 1959, the Attorney General moved for dismissal of the petition, stating: The petition in this case was filed December 20, 1955. Hearings began in New York City on May 13, 1957. Shortly thereafter the taking of testimony was suspended in order that the * * * [SACB] might consider and determine various motions filed by the respondent union and several local affiliates. On January 10, 1958, * * * [SACB] sua eponte stayed all further proceedings pending its determination of the Communist Party case, which at that time had been remanded to it by the Court of Appeals for the District of Columbia. The case remained in suspenso until February 19, 1959, when, by *101 * * * [SACB] order, hearings were scheduled to resume in New York City on March 17, 1959. * * *
On March 30, 1959, the SACB issued a report and order dismissing the petition. During the years in issue, UE had a retainer agreement with counsel under which counsel agreed: * * * to assume responsibility for litigation and other legal problems with which the UE or its officers may be faced during the year * * *, to render ourselves available for advice and consultation on legal problems confronting the UE at the request of its General Counsel, and to prepare for trial and to participate together with the Union General Counsel in the pending Matles case. * * *
During 1954 and 1955, the sum paid by UE pursuant to the retainer agreement included "any supplementary or extraordinary legal work occasioned by the Matles case." On or about June 15, 1956, changes were proposed in the retainer agreement necessitating additional expenditures by UE so that counsel could "devote more time * * * to the SACB case, the Matles case, and other UE matters" and "put on immediately a research person to get to work on a number of problems involved in both SACB and Matles * * *." Bills *102 sent to UE by counsel dated September 13, October 11, and November 11, 1955, contain substantially the same language. UE was billed on September 13, 1955, for "research and preparation for 4 week period in U.S. v. Matles, and research and preparation for SACB proceeding * * *." Bills sent to UE by counsel, dated October 15 and November 15, 1956, were headed, "Re Matles and SACB." On June 18, 1956, the Chairman of the Internal Security Subcommittee of the United States Senate noted in a letter to the Attorney General that: * * * leading Polish Communist until his defection a few months ago, recently told the Internal Security Subcommittee that propaganda prepared by * * * [UE] in the United States is the most effective propaganda device being used today by the Polish Communist leaders against their people. * * * Two of the leaders of this union have been * * * [petitioner] and James Lustig. Both have been demonstrated to be Communists and the subject of denaturalization proceedings. I believe that your office filed denaturalization suits against them on February 13, 1952, and on December 16, 1952, respectively. Since that time apparently nothing has been done to enable *103 the immigation authorities to follow up on their deportation proceedings. * * *
May we have your assurance that the Department of Justice is taking all possible steps to expedite the denaturalization and deportation of the named individuals, and of others in the same position? On June 26, 1956, the Acting Deputy Attorney General responded to this letter in part as follows: As indicated in your letter, judicial proceedings to denaturalize the individuals referred to have been pending in the United States District Courts for the Southern and Eastern Districts of New York for some time. The delay in the actual trial of these cases has been due not only to congested trial calendars but also to an important legal issue which was but recently settled by the Supreme Court. In United States v. Zucca (125 F. Supp. 551 (S.D.N.Y., 1954)), it was held that revocation proceedings cannot be maintained unless the affidavit showing good cause therefor is filed with the complaint. This decision was affirmed by the Court of Appeals for the Second Circuit (221 F. 2d 805). Since the filing of the affidavit would be disadvantageous to the Government, the Department *104 requested Supreme Court review. Pending Supreme Court decision, the cases filed without affidavits in the district courts within the second circuit were removed from the trial calendars. On April 30, 1956, the Supreme Court ruled, by a 5-to-4 vote, that the affidavit must be filed, United States v. Zucca (351 U.S. 91). * * *
The Matles case in the eastern district of New York has already been set for trial and efforts are being made to have it placed at the head of the nonjury civil calendar for the October term.it will be personally presented by the Chief of the Criminal Division of that district. * * * On or about September 21, 1956, counsel gave notice to the United States District Court for the Eastern District of New York that a motion would be made to strike the case of United States v. Matles from the top of the day calendar for trial in the civil nonjury part on October 1, 1956. In an affidavit opposing the motion to strike, dated September 25, 1956, the Assistant United States Attorney for the Eastern District of New York stated: This is a matter for the denaturalization of the defendant, James J. Matles, who is probably the main guiding spirit of *105 * * * [UE], a strong labor union whose members are engaged in plants where secret and sensitive work is being performed on behalf of the United States Government. This is the same union which recently conducted a long strike against Westinghouse Electric Company, and defendant James J. Matles represented the union in these negotiations. If the Government's charge be correct, it would be extremely dangerous to permit the defendant to continue in this position any longer than absolutely necessary, and a speedy determination is essential for the security of the country. On September 26, 1956, the motion to strike was granted. On November 14, 1956, petitioner was found guilty of contempt of court in United States v. Matles (District Court, Eastern District of New York, Civil No. 24435), which conviction was affirmed on appeal (247 F. 2d 378 (C.A. 2, 1957)). In a per curiam opinion, Matles v. United States, 356 U.S. 256 (1958), the Supreme Court stated: * * * the judgment of the Court of Appeals for the Second Circuit is reversed and the case is remanded to the District Court with directions to vacate the order holding the petitioner in contempt and *106 to dismiss the complaint. * * * An affidavit showing good cause is a prerequisite to the initiation of denaturalization proceedings. The affidavit must be filed with the complaint when the proceedings are instituted. United States v. Zucca, 351 U.S. 91, 99-100. While the contempt of court conviction was on appeal, petitioner's citizenship was revoked and his certificate of naturalization was cancelled on the ground that it had been fraudulently and illegally procured. United States v. Matles, 150 F. Supp. 85 (E.D.N.Y., 1957). This judgment was opened for the purpose of taking additional testimony. United States v. Matles. 154 F. Supp. 574 (E.D.N.Y., 1957). Pursuant to the opinion of the Supreme Court in Matles v. United States, supra, the complaint was dismissed. No other complaint was filed or further action taken with respect to the denaturalization of petitioner. In 1949, petitioner's mother, Anna Friedman (hereinafter referred to as Anna) became a resident of the Home and Hospital of the Daughters of Israel, Inc., in New York City (hereinafter sometimes referred to as the Home), an affiliate of the Federation of Jewish *107 Philanthropies, upon agreement that petitioner would pay the Home $698 yearly toward her support and maintenance, and that she would pay the Home the amount she received yearly in Social Security payments, which amount totaled $402 in 1949. From 1942 to the time of her entry into the Home in 1949, petitioner had furnished the principal support for his mother. Anna became ill with an ulcer and had to postpone the first date set for her entry into the Home in 1949. The rules of the Home required those entering to be ambulatory. Until accepted into the Home, the person could not be admitted into the hospital. When she entered the Home, Anna was ambulatory. When Anna entered the Home, she suffered from diabetes, for which she received primarily a special diet and also insulin injections, a proneness to falling, and ulcers, which also required a special diet. Anna died in 1961 as a result of a hip fracture from which she never recovered. Petitioner generally made weekly visits to his mother. On the few occasions when petitioner could not visit his mother because he was out of the city on UE business, his wife would do so if possible. Petitioner would take Anna food supplements and *108 additional foods when he visited her. On each visit petitioner tipped the attendants and other Home personnel who assisted Anna and left Anna money for telephone calls and incidental expenses. The Home's cost for Anna's maintenance was $1,821.35 in 1955 and $2,093.52 in 1956. In each of these years petitioner paid $698 directly to the Home and spent $900 for clothes, food supplements, tips to attendants and incidental expenses for his mother. The total amount spent for Anna's support in 1955 was $2,721.35, of which petitioner spent $1,598. The total amount spent for Anna's support in 1956 was $2,993.52, of which petitioner spent $1,598. Petitioners paid total amounts for medical services for themselves and their infant daughter of $115 in the year 1955 and $149 in the year 1956. Petitioners on their joint income tax returns for 1955 and 1956 did not report any income from the payment by UE of legal expenses with respect to the denaturalization proceedings against petitioner; they claimed a dependency deduction for Anna and medical expense deductions computed by including in medical expenses the $698 paid to the Home for Anna. Respondent increased petitioners' reported income *109 by amounts stated to have been paid by UE for petitioner's legal expenses, disallowed the exemptions claimed for Anna and disallowed the deductions claimed for medical expenses with the following explanation: It is held that legal expenses paid by your employer, * * * [UE] on your behalf, in connection with certain legal proceedings in which you were a defendant litigant, in the years 1955 and 1956 in the amount of $8,600.00 and $6,830.98, respectively, constitute salary income to you which you failed to report in your income tax returns for those years. Accordingly, your salary income for the years 1955 and 1956 has been increased in the amounts of $8,600.00 and $6,830.98, respectively. * * *
Deductions for medical expenses claimed in your income tax returns for the years 1955 and 1956 in the respective amounts of $777.57 and $734.61, are disallowed for the reasons that the sums of $698.00 paid to the Home and Hospital of the Daughters of Israel, Inc. on behalf of your aged mother in each year constitutes the cost of meals and lodging and not medical expenses; your mother has not qualified as a dependent * * *, and, with respect to the other expenses included in the claimed *110 deductions, no competent evidence or appropriate information has been submitted in substantiation thereof. Exemptions for dependents in the amounts of $600.00 and $600.00 claimed in your income tax returns for the years 1955 and 1956, respectively, on behalf of your aged mother, Mrs. Anna Friedman, are disallowed for the reason that less than one-half of her support was received from you. Opinion Petitioner takes the position that the legal fees were paid by UE on its own behalf and for its own benefit and were, therefore, solely its expenses. From this petitioner concludes that while the payments may have indirectly and incidentally benefited him, he did not derive such economic or financial benefit therefrom as to have the amounts constitute additional compensation includable in his taxable income. Both parties recognize that the definition of gross income contained in section 61(a) of the Internal Revenue Code of 1954[1] is broad enough to include "any economic or financial benefit conferred on the employee as compensation, whatever the form or mode by which it is effected." Commissioner v. Smith, 324 U.S. 177, 181 (1945), rehearing denied *111 324 U.S. 695; Commissioner v. LoBue, 351 U.S. 243 (1956); and United States v. Woodall, 255 F. 2d 370 (C.A. 10, 1958), certiorari denied 358 U.S. 824 (1958). That the payment of attorney's fees by an employer for the benefit of an officer or employee may constitute income to the officer or employee has been specifically held by this and other courts. Frank J. Matula, Jr., 40 T.C. 914 (1963); Irving Sachs, 32 T.C. 815 (1959), affd. 277 F. 2d 879 (C.A. 8, 1960), certiorari denied 364 U.S. 833 (1960); and Beer v. United States, 132 F. Supp. 282 (S.D.Ala., 1955). It is inconsequential whether such payment is considered additional compensation to the employee, since the intent of the statute is to tax "all gains except those specifically exempted." James v. United States, 366 U.S. 213, 219 (1961). Petitioner does not take the position that the payments here involved are "specifically exempted." He contends, however, that a payment by an employer for its own *112 benefit does not result in income to an employee where the employee is only incidentally benefited by such payment. Petitioner cites no cases directly in point, but argues that this conclusion follows from cases holding that attorneys' fees paid by employers in connection with legal actions involving officers or employees are deductible by the employers as ordinary and necessary business expenses. See Union Investment Company, 21 T.C. 659 (1954), and Robert S. Howard, 32 T.C. 1284, 1296 (1959). These cases do not deal with the nature of the payment from the standpoint of the officers or employees. Cf. John E. Cavanagh, 36 T.C. 300, 304 (1961). The facts in the instant case show that the denaturalization proceedings arose out of circumstances which were not proximately related to the business of UE. The denaturalization proceeding was against petitioner personally and arose out of acts alleged to have been committed prior to his employment by UE. Assuming that in the course of the denaturalization proceeding the evidence would involve petitioner's acts throughout the time he was an employee of UE, petitioner's alleged acts which gave rise *113 to the necessity for the legal expenses were not proximately related to the business of UE. [2] The proceeding originated from alleged acts committed by petitioner in 1934 and prior thereto, even though his acts after that date might be admissible in evidence. Lewis v. Commissioner, 253 F. 2d 821 (C.A. 2, 1958), affirming 27 T.C. 158 (1956); and B. W. Sturdivant, 15 T.C. 880 (1950). Cf. Commissioner v. Shapiro, 278 F. 2d 556 (C.A. 7, 1960), affirming a Memorandum Opinion of this Court; and Waldo Salt, 18 T.C. 182 (1952). *114 Petitioner alternatively contends that if the legal expenses paid by UE for the defense of his denaturalization proceedings are includable in his income, those amounts are then deductible as his ordinary and necessary business expenses. If the legal expenses were in fact ordinary and necessary business expenses of petitioner, they would, when includable in petitioner's income, be deductible, since such inclusion in income would in effect result in his making the payment. Beer v. United States, supra.However, the evidence does not support petitioner's contention that the legal expenses were his ordinary and necessary business expenses. Our conclusion that petitioner's denaturalization proceeding dealt with occurrences which had no connection with petitioner's business but rather concerned his personal acts in obtaining citizenship disposes of this contention. For this reason the instant case is distinguishable from Paul Draper, 26 T.C. 201 (1957), and John W. Clark, 30 T.C. 1330 (1959), relied upon by petitioner. Petitioner stresses the fact that he was ultimately successful in the denaturalization proceedings and equates this with acquittal *115 in a criminal proceeding. He argues that because of this similarity, the legal expenses are deductible. There are cases holding that legal expenses paid in connection with a criminal proceeding are deductible if the trial results in acquittal, in situations where the alleged criminal activity was proximately connected with the taxpayer's business. Commissioner v. Shapiro, supra; Robert S. Howard, supra; and Morgan S. Kaufman, 12 T.C. 1114 (1949). Since we have held that petitioner's alleged activities were not related to his business, petitioner's reliance on these cases is likewise misplaced. Richard F. Smith, 31 T.C. 1, 10 (1958). We hold that the legal expenses paid by UE in connection with petitioner's denaturalization proceedings are properly includable in his income and are not deductible by him. Petitioner asserts on brief that the amounts of the legal expenses included in his income by respondent's determination exceeded the amounts of such legal expenses paid by UE which are properly allocable to his denaturalization proceedings. There is no evidence in the record to show that the amount of legal expenses paid *116 by UE in connection with his denaturalization proceedings was other than the amount determined by respondent. Because of this failure of proof we have no basis for finding an amount of legal expenses paid by UE on behalf of petitioner different from that determined by respondent. We have found facts which show that petitioner paid over one-half of his mother's support in each of the years 1955 and 1956. On the basis of these findings we hold that petitioner is entitled to a deduction for a dependency credit exemption for his mother in each of the years 1955 and 1956. We have found the amount of the medical expenses paid by petitioner in each of the years 1955 and 1956, excluding any payment on behalf of his mother. The amounts we have found are insufficient to result in any medical expense deduction unless a portion of petitioner's payments on behalf of his mother is properly to be considered as medical expenses. It is petitioner's position that the $698 which he paid to the Home for Anna in each of the years here involved was a medical expense. The record does not show that the $698 was paid for anything other than room and board, so we must assume that it was for Anna's room *117 and board. Where the principal reason for a person's presence at an institution such as a home for the aged is to receive medical care and the costs of room and board at the home are incidental to such care, the costs of room and board constitute medical expenses. W. B. Counts, 42 T.C. - (July 23, 1964). The facts in the instant case are insufficient to show that a principal reason for Anna's presence at the Home was to receive medical care. We cannot assume this necessary fact from a description of Anna's various infirmities. Petitioners have failed to establish that any portion of the $698 payment to the Home on behalf of Anna in either 1955 or 1956 constituted medical expenses. Decision will be entered under Rule 50. Footnotes
1. All references are to the Internal Revenue Code of 1954 unless otherwise stated.↩
2. The evidence in the instant case shows that there was an investigation and later a proceeding directly involving UE before the Subversive Activities Control Board, and that some of the investigative work necessary in connection with this proceeding would also be needed in defense of petitioner's denaturalization proceeding. Assuming whatever legal expenses paid in connection with the investigation and proceeding before the SACB were ordinary and necessary business expenses of UE, such fact would not cause the expenses paid for defense of petitioner to become likewise ordinary and necessary business expenses of UE.↩